# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

FIRST AMERICAN TITLE INSURANCE COMPANY,

    Plaintiff,

    v.                                      Case No. 12-CV-1210

WESTBURY BANK,

    Defendant.

## ORDER ON THE DEFENDANT'S MOTION TO DISMISS

### I. FACTS AND PROCEDURAL HISTORY

During its tenure as an agent for First American Title Insurance Company ("First American"), New Horizon Title, LLC ("New Horizon") misappropriated more than $3.5 million in escrow funds, forcing First American to cover these losses. (Docket No. 1, ¶¶5-6, 31, 189.) But the present action does not involve New Horizon; First American already obtained a judgment against New Horizon and its members. (Docket No. 1, ¶190; see also Waukesha County Circuit Court Case No. 2011CV001381.) Rather, in the present action, which comes before this court based upon the diversity of the parties, First American alleges that Westbury Bank ("Westbury"), the institution where New Horizon maintained its bank accounts, bears some responsibility for First American's losses.

First American sets forth six causes of action against Westbury. (Docket No. 1.) In response to the complaint, Westbury filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Docket No. 10.) First American has responded to the motion, (Docket No. 13), and Westbury has replied,

(Docket No. 15). The pleadings on this motion are closed and the matter is ready for resolution. All parties have consented to the full jurisdiction of a magistrate judge. (Docket Nos. 6, 8.)

New Horizon maintained three accounts with Westbury, respectively titled "Escrow Account," "Operating Account," and "Recording Account." (Docket No. 1, ¶¶11, 14.) In less than three-and-a-half years, New Horizon overdrew the escrow account more than a thousand times. (Docket No. 1, ¶36.) It bounced 348 checks for a total of nearly $60 million. (Docket No. 1, ¶39.) For all these overdrafts and bounced checks, Westbury charged New Horizon nearly $40,000.00 in fees, along with an additional $1,526.00 in stop payment fees and $196.00 in fees for having the account overdrawn on consecutive days. (Docket No. 1, ¶¶38-44.)

First American alleges that Westbury knew or should have known that New Horizon was misappropriating escrow funds but did nothing to stop New Horizon because New Horizon's fraud was very lucrative for Westbury. In total, Westbury collected $40,943.00 in fees related to malfeasance in the escrow account, all of which Westbury collected by deducting funds from the escrow account. (Docket No. 1, ¶¶44-45.) Thus, First American alleges that Westbury aided and abetted New Horizon's conversion, theft, and breach of fiduciary duty, (second, third, and fourth causes of action), and directly breached its duty of good faith under Wisconsin's Uniform Fiduciaries Act, (fifth cause of action). With respect to Westbury collecting the fees incurred by New Horizon by deducting these fees from the escrow account, First American contends that this was improper because Westbury knew or reasonably should have known that the funds in the escrow account did not belong to New Horizon (first cause of action). First American also presents a claim for "quantum meruit / unjust enrichment." (sixth cause of action).

Westbury argues that it cannot be responsible for New Horizon's actions because, although entitled "Escrow Account," this was merely an ordinary deposit account rather than a formal escrow account with the additional obligations such an account imposes upon an institution. (Docket No. 15

at 3-7.) Moreover, as a non-customer with no relationship with Westbury, it owed no duty to First American. (Docket No. 11 at 7-11.) Rather, it contends that it was obligated to execute the transactions that New Horizon initiated, and based upon its agreement with New Horizon, it was entitled to deduct fees from the escrow account, (Docket No. 11 at 11-13). Because Westbury was entitled to the fees it deducted from New Horizon's escrow account, it contends that First American's unjust enrichment claim fails. (Docket No. 11 at 18-19.) Finally, Westbury argues that First American's other claims fail because the complaint fails to allege facts from which a factfinder could conclude that Westbury knew of New Horizon's misappropriation. (Docket No. 11 at 13-18.)

In response, First American contends that all of Westbury's arguments with respect to the absence of any duty owed First American are inapposite because duty is relevant only within a negligence claim and First American alleges Westbury acted intentionally. (Docket No. 13 at 4-5.) It contends that Westbury knew or should have known that the funds in the escrow account did not belong to New Horizon and thus should not have collected from the escrow account the bank fees New Horizon incurred. (Docket No. 13 at 6-12.) As for the other causes of action, it contends that the repeated overdrafts from the escrow account did or should have alerted Westbury that New Horizon was misappropriating these funds but yet Westbury decided to allow New Horizon's fraud to continue so it could continue collecting fees.

## II. MOTION TO DISMISS STANDARD

A civil complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The Rule reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." Brooks v. Ross, 578 F.3d 574, 580 (7th Cir. 2009) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002)); see also Swanson v. Citibank, N.A., 614

F.3d 400, 404 (7th Cir. 2010) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1215 at 165-173 (3d ed. 2004) ("[A]ll that is necessary is that the claim for relief be stated with brevity, conciseness, and clarity.")).

In recent years, the Supreme Court addressed the question of just how short and plain that statement may be. See Ashcroft v. Iqbal, 556 U.S. 662 (2009); Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). The Court of Appeals for the Seventh Circuit synthesized the recent holdings of the Court regarding the pleading standard set forth in Rule 8(a)(2) and stated:

> First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

Brooks, 578 F.3d at 581.

This trio of Supreme Court cases did not somehow reinstate the old fact-pleading requirements and it remains true that specific facts are not necessary. Swanson, 614 F.3d at 404. Although detailed factual allegations are not required, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. 662, 678 (citing Twombly, 550 U.S. at 555).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Id. at 678 (quoting Twombly, 550 U.S. at 556, 557, 570) (internal citations and quotation marks omitted).

> Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief.

Id. at 679 (internal citations, brackets, and quotation marks omitted). A complaint is not insufficient merely because "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556 (internal quotation marks omitted).

As this court has said before,

> The amount of facts that must be alleged in a complaint to present a plausible claim will vary based upon the nature of the claim. Certain claims may require a relatively minimal factual recitation to present a plausible claim (e.g. a claim to recover on a contract for nonpayment) whereas others might require substantially more detailed factual allegations to demonstrate plausibility (e.g. an antitrust claim). In Twombly, the plaintiffs attempted to allege a violation of § 1 of the Sherman Act, 15 U.S.C. § 1. In Iqbal, the plaintiff attempted to defeat a claim of qualified immunity and demonstrate that high-ranking government officials violated the First and Fifth Amendments by approving a policy that allegedly harmed the plaintiff. The natures of the claims in both these cases were such that they would necessarily require substantially more factually intensive pleadings than many more routine cases. Thus, courts must be cautious so as to not interpret Twombly and Iqbal as requiring detailed factual recitations for all complaints simply because more detailed factual allegations were required in those cases due to the nature of the claims alleged.

EEOC v. Universal Brixius, 264 F.R.D. 514, 517 (E.D. Wis. 2009). "[I]n many straightforward cases, it will not be any more difficult today for a plaintiff to meet that burden than it was before the Court's recent decisions." Swanson, 614 F.3d at 404.

## III. ANALYSIS

### A. Escrow Account

Westbury argues that New Horizon's escrow account was, as far as Westbury knew, an ordinary deposit account. (Docket No. 11 at 6.) It notes that there is no allegation that Westbury entered into an escrow agreement with either New Horizon or First American. (Docket No. 11 at 6-7.) While the account was titled "Escrow Account," Westbury contends that the name a customer

5

attaches to its account is meaningless. (Docket No. 15 at 3.) It contends that simply because New Horizon named the account "Escrow Account," this did not alter the account's status as a general deposit account or impose any special duties upon Westbury. In support of its contention that First American's allegations are insufficient, Westbury points to Bell Bros. v. Bank One, N.A., 116 F.3d 1158, 1160 (7th Cir. 1997), Ruben v. Banking Comm'n of Wisconsin, 216 Wis. 98, 256 N.W. 712 (1934), and Quilling v. Nat'l City Bank of Michigan/Illinois, 99 C 50412, 2001 WL 1516732 (N.D. Ill. Nov. 27, 2001). (Docket No. 15 at 3-4.)

However, these cases are distinguishable. The claim in Bell Bros. arose under Indiana law and depended upon the bank being an escrow agent notwithstanding the fact that the relevant funds were undisputedly deposited into a general account by the perpetrators of a fraud rather than directly by the plaintiff investors as is required to create an escrow under Indiana law. Bell Bros., 116 F.3d at 1160. Here, there is no contention that Westbury was ever an escrow agent and First American's claims do not depend upon such a finding. It is undisputed that New Horizon, not Westbury, was the escrow agent.

Ruben involved the special circumstances of a bank failure and the question of whether funds held in a trustee's checking account should be regarded as special, akin to when the bank acts as trustee and thus subject to return to the trustee, or general, where a debtor-creditor relationship exists vis-à-vis the trustee and the bank and the therefore the funds should be treated as those of any other depositor. The court concluded that while there was undisputedly a trust relationship between the estate and the trustee, there was no special relationship between the trustee and the bank, and therefore the funds must be treated as a general deposit. Ruben, 216 Wis. 98, 256 N.W. at 714. Here, to the extent that First American may argue that the deposits constituted a "special deposit," any such argument does not appear to be inconsistent with the ultimate holding in Ruben that absent a special agreement, the relationship between a bank and its depositor is that of debtor and creditor.

6

Finally, Quilling came before the court on a motion for summary judgment, at which point the court concluded that the plaintiffs had failed to muster sufficient facts demonstrating that the defendant bank knew of its customer's fraud. 2001 WL 1516732, 10. This is not the question presently before this court; the court's concern at this stage is the sufficiency of the plaintiff's pleadings, not its proof.

First American does not contend that naming the account "Escrow Account" alone necessarily transformed the account into a special deposit. Rather, it points to the account's title to support its contention that Westbury knew that New Horizon used the account to hold the property of others in trust. While the name of the account itself did not necessarily impose any duty upon Westbury, if the name, along with other factors, resulted in the bank's knowledge of the special status of the deposits in that account, it could not feign ignorance and rest upon the fact that its knowledge did not come through more formal means.

### B. Setoffs

Westbury contends that First American's first claim regarding the deduction of fees from the escrow account fail as a matter of law because charging bank fees is not a setoff.

First American responds that the collection of the fees was a setoff, (Docket No. 13 at 6), but acknowledges that perhaps what happened here does not fit the traditional definition of a setoff. A "setoff" is traditionally reserved for involuntary deductions to pay off another debt, for example when a bank customer defaults on a loan and so the bank, without explicit permission from the customer, takes funds from the customer's savings account to cover the loan. Here, as part of a routine deposit agreement, New Horizon presumably agreed that overdraft and other fees would be deducted from its escrow account and thus the debits were not involuntary. But irrespective of the term that best describes Westbury's actions, First American contends that it was improper for Westbury to collect New Horizon's obligations from a special deposit account that held funds that

did not belong to New Horizon. (Docket No. 13 at 6-8.) Thus, the question is whether, as a matter of law, Westbury was entitled to deduct from that escrow account the fees it charged to New Horizon for transactions on the escrow account, notwithstanding Westbury's alleged knowledge that the funds in that account did not belong to New Horizon?

Neither party points to any case directly answering this question. Westbury cites cases that hold that banks may collect fees from deposits consisting of funds that are normally exempt from collection. For example, in Lopez v. Wash. Mut. Bank, F.A., 2002 U.S. App. LEXIS 24344 (9th Cir. Aug. 6, 2002), the court rejected the plaintiffs' contention that a bank is barred from using funds resulting from social security benefits to cover overdrafts and pay overdraft fees. While social security benefits are ordinarily exempt from collection, 42 U.S.C. §§ 407(a), 1383(d)(1), the court concluded that this prohibition did not apply since the plaintiffs consented to the deduction when they executed the deposit agreement. Lopez, 2002 U.S. App. LEXIS 24344, 11-12. The court distinguished one of its earlier cases, Nelson v. Heiss, 271 F.3d 891 (9th Cir. 2001), and a decision from the Tenth Circuit, Tom v. First American Credit Union, 151 F.3d 1289 (10th Cir. 1998), where the courts held that institutions ran afoul of the statutory prohibition upon the use of certain public benefits for the payment of debts on the grounds that in neither of those cases did the payor voluntarily consent to the deduction. The court in Wilson v. Harris N.A., 2007 U.S. Dist. LEXIS 65345 (N.D. Ill. Sept. 4, 2007), similarly concluded that the bank did not improperly collect an overdraft fee by deducting it from the plaintiff's checking account, notwithstanding the fact that the funds in that account came from social security benefits. Thus, Westbury contends that these cases establish that as a matter of law, the collection of banking fees such as overdrafts are not setoffs.

But this line of cases is distinguishable in that they addressed funds that undisputedly belonged to the obligor but were nonetheless statutorily exempt from collection. The cases do not stand for a broad holding on the character of bank fees but rather a narrow interpretation of whether

8

Case 2:12-cv-01210-AEG   Filed 04/17/13   Page 8 of 20   Document 19

such fees came within the statutory bar upon subjecting social security benefits to "execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law," 42 U.S.C. § 407(a).

In the present case, the funds did not belong to the obligor and there is no applicable statute governing the question before the court. Thus, First American cites cases where courts have held that a bank may not satisfy an obligation by taking funds from a "special account" held in the name of the obligor or from funds held in the name of the obligor but belonging to someone else. (Docket No. 13 at 7-9 (discussing In re Nat Warren Contracting Co., Inc., 905 F.2d 716 (4th Cir. 1990); Brovan v. Kyle, 166 Wis. 347, 165 N.W. 382 (1917); In re Warren's Bank, 209 Wis. 121, 244 N.W. 594 (1932); Commercial Disc. Corp. v. Milwaukee W. Bank, 61 Wis. 2d 671, 214 N.W.2d 33 (1974)).)

The Wisconsin Supreme Court held in Brovan that a bank could not benefit from a guardian's misappropriation of a ward's property and thus it had to return to the ward the funds that the guardian misappropriated from the ward and used to pay off the guardian's personal loan with the bank. Brovan, 165 N.W. at 384. Because the check that the bank allowed the guardian to deposit into his personal account was made out to and endorsed by him in his capacity as guardian, the court concluded that this was sufficient to alert the bank that the guardian did not personally have a right to these funds. Id. Later, in Warren's Bank, the court concluded that when a business had a longstanding practice of depositing funds with a bank specifically to enable its employees to cash their checks at the bank, those funds were a special deposit that belonged to the business and not bank (or the commissioner of banking who subsequently took over the bank). The court noted, "It seems to be well settled that a deposit made in a bank for a specific purpose, and for that alone, partakes of the nature of a special deposit…." Warren's Bank, 244 N.W. at 595. Finally, in Commercial Discount, the court adopted an "equitable" rule to "determine the rights of a bank to set

9

off against the account of a depositor which contains funds to which a third party has a valid prior claim" and concluded that when an entity had a perfected security interest in a debtor's bank account, the deposit bank could not use these funds to set off a defaulted loan of the debtor. Commercial Disc., 61 Wis. 2d at 682-83, 214 N.W.2d at 39. Thus, First American contends that by virtue of the account being entitled "Escrow Account," Westbury knew that funds deposited into that account did not belong to New Horizon but were instead deposited for the special purpose of facilitating real estate closings, and therefore Westbury could not use these funds to satisfy New Horizon's obligation to pay bank fees.

Perhaps "improper setoffs" is not technically the proper term for the malfeasance First American alleges in its first cause of action. But there is nothing to indicate that the viability of the claim depends upon the deductions being characterized as setoffs. First American could have turned to a thesaurus and used a wide variety of terms in place of the technical term "setoff" to describe the sort of improper deductions it alleges that Westbury took from the escrow account. "Pleadings must be construed so as to do justice," Fed. R. Civ. P. 8(e), and thus it appears that any allegedly improper label is of little consequence at this stage.

The complaint adequately alleges that the overdraft and other bank fees were the responsibility of the customer, New Horizon. As the Wisconsin Supreme Court made clear in the cases discussed above, a bank may not *knowingly* permit a customer to pay its obligations to the bank by using funds belonging to another. Knowledge is key. Cf. Nat'l Bank of Georgia v. Weiner, 180 Ga. App. 61, 64, 348 S.E.2d 492, 496 (1986) (affirming dismissal of claim that bank improperly setoff debtor's overdraft using funds from a separate escrow account because plaintiff failed to present evidence that the bank knew the funds were escrow funds). Here, the complaint alleges that Westbury knew that the funds it was utilizing to satisfy New Horizon's obligations did not belong to New Horizon. (Docket No. 1, ¶46.) Thus, based upon the authority cited by the

10

parties, the court concludes that the allegations contained in the complaint with respect to the first cause of action are sufficient to state a claim under Wisconsin law.

### C. Aiding and Abetting

First American alleges that Westbury aided and abetted New Horizon's conversion or misappropriation (second cause of action), theft (third cause of action), and breach of fiduciary duty (fourth cause of action). (Docket No. 1, ¶¶202-228.) First American also alleges that Westbury is responsible as a principal for conversion or misappropriation (second cause of action) and theft (third cause of action) for Westbury's collection of fees from the escrow account, but for present purposes, the court's discussion is limited to only First American's aiding and abetting claims. The distinction is significant. As a principal, Westbury is responsible for its own acts collecting roughly $40,000.00 in fees. As an aider and abettor, Westbury could be responsible for all of New Horizon's $3.5 million misappropriation.

Under Wisconsin law, a person aids or abets another's tortious conduct when he "(1) undertakes conduct that as a matter of objective fact aids another in the commission of an unlawful act; and (2) consciously desires or intends that his conduct will yield such assistance." Tensfeldt v. Haberman, 2009 WI 77, ¶26 n. 12, 319 Wis. 2d 329, 768 N.W.2d 641.

Westbury contends that the aiding and abetting claims contained in First American's second, third, and fourth causes of action must be dismissed because the complaint fails to adequately allege that Westbury knowingly participated in any unlawful act of New Horizon's. (Docket No. 11 at 13-15.) In Westbury's view, First American presents merely conclusory allegations as to Westbury's knowledge of New Horizon's malfeasance and fails to present factual allegations sufficient to support the conclusion that Westbury aided and abetted New Horizon's actions. (Docket No. 15 at 9-10.) In support, it cites an unpublished court of appeals decision, Grad v. Associated Bank, N.A., 2011 WI App 114, where the court affirmed the dismissal of a complaint for the plaintiff's failure to

allege that the defendant bank intended to assist its customer's tortious conduct. Westbury contends that First American has, at most, alleged that Westbury failed to prevent New Horizon's unlawful conduct but this, as a matter of law, is insufficient. (Docket Nos. 11 at 15; 15 at 10 (citing Grad, 2011 WI App 114, ¶¶28, 30-31; Winslow v. Brown, 125 Wis. 2d 327, 335, 371 N.W.2d 417, 422 (Ct. App. 1985)).)

First American's theory of aider and abettor liability, as the court reads the complaint, is simple. It contends that Westbury knew that New Horizon was misappropriating escrow funds. Faced with this knowledge, Westbury could have done a number of things to have ended the fraud, including closing the account. But it did not and instead continued to process the transactions initiated by New Horizon. By doing so it aided New Horizon in committing this fraud. Westbury consciously desired to have this fraud continue because it enabled Westbury to continue to collect fees.

As a preliminary matter, the complaint must adequately allege that Westbury knew that New Horizon was misappropriating funds that did not belong to it. The court concludes that this knowledge may be reasonably inferred from the fact that there were so many overdrafts from an account identified as an escrow account, and thus it is plausible that Westbury knew of New Horizon's misappropriation.

With respect to the first element of aider and abettor liability, Westbury contends that First American's claims fail because First American alleges only that Westbury failed to act. Not only did Westbury not owe any duty to First American but by not acting, a person necessarily does not "undertake[] conduct." However, it depends on the attendant circumstances as to whether inaction can be considered the equivalent of action. By not taking action to close the account, Westbury continued to process New Horizon's transactions. While Westbury contends that it was obligated to execute the transactions New Horizon initiated, (Docket No. 11 at 14), it offers no authority to

12

suggest that any such obligation extended to transactions that Westbury knew were part of a fraud. By processing New Horizon's transactions after allegedly knowing of New Horizon's fraud, Westbury plausibly, "as a matter of objective fact[,] aid[ed] another in the commission of an unlawful act." Thus, the court moves on to the question of whether First American has adequately pled that Westbury consciously desired or intended that its conduct would assist New Horizon in New Horizon's fraud.

In support of its allegation that Westbury consciously desired or intended to assist New Horizon in its fraud, First American offers nothing more than the observation that the longer New Horizon's fraud continued, the more Westbury would earn in fees. From this, Westbury seeks to imply that Westbury wanted the fraud to continue.

The court concludes First American need not offer anything more at this very early stage in the proceedings. Accepting as true First American's allegations that Westbury knew of New Horizon's fraud, it is certainly plausible that Westbury continued to process New Horizon's transactions, and thus enable New Horizon's fraud and breach of fiduciary duty, because it wanted New Horizon's actions to continue so Westbury could continue to collect its fees. While providing ordinary banking services, standing alone, is unlikely to form the basis for liability as an aider and abettor to a customer's fraud, this is not true if a bank continues to provide those services with knowledge of the customer's fraud. Cf. Lawyers Title Ins. Corp. v. United Am. Bank of Memphis, 21 F. Supp. 2d 785, 801 (W.D. Tenn. 1998). Thus, First American has adequately stated a claim that Westbury aided and abetted New Horizon's conversion or misappropriation (second cause of action), theft (third cause of action), and breach of fiduciary duty (fourth cause of action).

### D. Uniform Fiduciary Act

Wisconsin's Uniform Fiduciaries Act ("UFA"), Wis. Stat. § 112.01, exists generally to protect financial institutions and others dealing with fiduciaries from liability for subsequent

malfeasance by that fiduciary. Bolger v. Merrill Lynch Ready Assets Trust, 143 Wis. 2d 766, 775, 423 N.W.2d 173, 176 (Ct. App. 1988). However, an exception exists if the financial institution knows of the fiduciary's breach of his obligation or the institution acts in bad faith. Id.; see also Willowglen Academy-Wisconsin, Inc. v. Connelly Interiors, Inc., 2008 WI App 35, ¶18, 307 Wis. 2d 776, 746 N.W.2d 570. Although some jurisdictions regard the UFA as simply establishing a defense rather than a cause of action, see Appley v. West, 832 F.2d 1021, 1031 (7th Cir. 1987), Wisconsin appears to accept that litigants may pursue a cause of action under its codification of the UFA, see, e.g., Willowglen, 2008 WI App 35, ¶1, 307 Wis. 2d 776, 746 N.W.2d 570 (referring to plaintiff's action as "a claim for money damages pursuant to the [UFA]"); Bolger, 423 N.W.2d at 178 (discussing whether, under the facts presented, the UFA "imposes liability" upon the defendant). First American's fifth cause of action is titled "Breach of Good Faith / Commercial Bad Faith" but in subsequent paragraphs, rather than referring to common law, it refers to only the UFA. Thus, the court regards First American as alleging a claim under Wis. Stat. § 112.01.

In its complaint, First American alleges that Westbury knew of New Horizon's misappropriation of escrow funds. (Docket No. 1, ¶231.) Alternatively, it argues that even if not arising to actual knowledge, New Horizon's conduct with respect to the escrow account was such that Westbury's failure to further investigate the matter amounted to bad faith. (Docket No. 1, ¶232.) Westbury contends that First American's fifth cause of action must be dismissed because First American has failed to adequately allege that Westbury violated the UFA and acted with actual knowledge of theft or bad faith. (Docket No. 11 at 15-18.) Westbury states: "While First American has alleged there was a large number of overdrafts and NSF checks over the years, there is nothing inherent about the allegations that means New Horizon was necessarily breaching fiduciary duties and that Westbury necessarily knew that to be the case." (Docket No. 11 at 17.)

14

The UFA does not define bad faith, but it does define a thing done in good faith as an act that "is in fact done honestly, whether it be done negligently or not." Wis. Stat. § 112.01(1)(b). In interpreting its own similar version of the UFA, "Illinois courts have fleshed out the definition of bad faith by explaining that it includes situations 'where the bank suspects the fiduciary is acting improperly and deliberately refrains from investigating in order that [the bank] may avoid knowledge that the fiduciary is acting improperly.'" Crawford Supply Group, Inc. v. LaSalle Bank, N.A., 09C2513, 2010 WL 320299, 8 (N.D. Ill. Jan. 21, 2010) (quoting Mikrut v. First Bank of Oak Park, 359 Ill.App.3d 37, 50, 295 Ill.Dec. 225, 832 N.E.2d 376, 385 (1st Dist. 2005)). "In determining whether the bank acted with bad faith, 'courts have asked whether it was 'commercially' unjustifiable for the payee to disregard and refuse to learn facts readily available.'" Appley v. West, 832 F.2d 1021, 1031 (7th Cir. 1987) (quoting Maryland Cas. Co. v. Bank of Charlotte, 340 F.2d 550, 553 (4th Cir. 1965) (applying North Carolina's version of the UFA)). The Supreme Court of New Jersey, relying in part upon Maryland Cas. Co., concluded that

> bad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary. It is not established by negligent or careless conduct or by vague suspicion. Likewise, actual knowledge of and complicity in the fiduciary's misdeeds is not required. However, where facts suggesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge.

New Jersey Title Ins. Co. v. Caputo, 163 N.J. 143, 155-56, 748 A.2d 507, 514 (2000); see also In re Broadview Lumber Co., Inc., 118 F.3d 1246, 1251 (8th Cir. 1997) ("'Bad faith' requires something more than mere negligence and can be found where the person accepting a negotiable instrument disregards circumstances that are suggestive of a breach and are sufficiently obvious such that it is in bad faith to remain passive.") (interpreting Mo. law); Richards v. Platte Valley Bank, 866 F.2d 1576, 1583 (10th Cir. 1989) ("The mere failure to make inquiry, even though there are suspicious circumstances, does not constitute bad faith unless the facts and circumstances are so cogent and

15

obvious that to remain passive would amount to deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." (citation omitted)).

A failure to inquire in the face of a single overdraft in an escrow account is unlikely to amount to bad faith. But "[a]t some point, obvious circumstances become so cogent that it is 'bad faith' to remain passive." Appley, 832 F.2d at 1031 (quoting Maryland Cas. Co., 340 F.2d at 553). Here, the conduct of New Horizon that First American alleges in the complaint is extensive and pervasive. Nearly $60 million in NSF checks and more than a thousand overdrafts resulting in roughly $40,000 in overdraft and NSF fees, all in an account titled "Escrow Account" appear, on the surface at least, to be pretty glaring red flags that something is not right. Thus, it is certainly plausible that Westbury knew of New Horizon's misappropriation or, at a minimum, there were so many patent warning signs that a failure to investigate amounted to bad faith. Therefore, Westbury's motion to dismiss this cause of action shall be denied.

### E. Quantum Meruit and Unjust Enrichment

Finally, First American's sixth cause of action is titled "quantum meruit / unjust enrichment." Thus, as litigants often do, the parties lump these two claims together with Westbury substantively addressing only the claim of unjust enrichment in its motion to dismiss. Westbury addressed quantum meruit only to state, "Quantum Meruit is awarded to avoid unjust enrichment," (Docket No. 11 at 18), which is technically correct but fails to describe the elements required to support a claim, which is distinct from a claim for unjust enrichment, see Ramsey v. Ellis, 168 Wis. 2d 779, 784-85, 484 N.W.2d 331, 333-34 (1992).

Westbury argues that First American's unjust enrichment claim fails as a matter of law because Westbury was entitled to charge the overdraft fees it did, and First American did not confer any benefit upon Westbury. (Docket No. 11 at 18-19.) First American responds that regardless of whether Westbury was entitled to charge New Horizon those fees, Westbury was not entitled to

16

collect those fees from the escrow account. (Docket No. 13 at 29.) Because the fees were paid from the escrow account, these deductions exacerbated the escrow shortage, and First American ultimately ended up covering these costs when it had to step in and indemnify lenders. (Docket No. 13 at 29.)

"Though related in theory and residing in the domain of contract law under the heading of quasi-contract, [quantum meruit and unjust enrichment each] has its own distinct elements of proof and measure of damages." Lindquist Ford, Inc. v. Middleton Motors, Inc., 557 F.3d 469, 476 (7th Cir. 2009) (citing Ramsey, 168 Wis. 2d at 784-84, 484 N.W.2d at 333-34). "In Wisconsin unjust enrichment is a legal cause of action governed by equitable principles. The action is 'grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust.'" Id. at 476-77 (quoting Watts v. Watts, 137 Wis. 2d 506, 530, 405 N.W.2d 303, 313 (1987)).

> Under Wisconsin law, an unjust enrichment claim requires a plaintiff prove that: (1) a benefit was "conferred upon the defendant by the plaintiff"; (2) there was an "appreciation by the defendant of the fact of such a benefit"; and (3) there was "acceptance and retention of the benefit by the defendant under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof."

Fail-Safe, LLC v. A.O. Smith Corp., 674 F.3d 889, 894 (7th Cir. 2012) (quoting Seegers v. Sprague, 70 Wis. 2d 997, 236 N.W.2d 227, 230 (1975)).

"Like unjust enrichment, quantum meruit is a legal cause of action grounded in equitable principles." Lindquist Ford, 557 F.3d at 477 (citing Tri-State Home Improvement Co. v. Mansavage, 77 Wis. 2d 648, 253 N.W.2d 474, 479 (1977)). However, quantum meruit is distinguished from unjust enrichment because a plaintiff can recover under quantum meruit even if he confers no benefit upon the defendant. Id. (citing Barnes v. Lozoff, 20 Wis. 2d 644, 123 N.W.2d 543 (1963)). "[T]o recover under quantum meruit, the plaintiff must prove that 'the defendant

17

requested the [plaintiff's] services' and 'the plaintiff expected reasonable compensation' for the services." Id. at 478 (quoting Ramsey v. Ellis, 168 Wis. 2d 779, 784, 484 N.W.2d 331, 333 (1992)).

When it comes to measuring damages, the causes of action differ in that "damages in an unjust enrichment claim are measured by the benefit conferred upon the defendant, while damages in a quantum meruit claim are measured by the reasonable value of the plaintiff's services." Ramsey, 168 Wis. 2d at 785, 484 N.W.2d at 333-34.

The allegations in the complaint do not fit a claim of quantum meruit. It was Westbury, not New Horizon (or First American) whose services were requested and who expected to be compensated, rather than the other way round. Therefore, to the extent that the complaint contains a separate cause of action for quantum meruit against Westbury, it shall be dismissed. Thus, the court turns to First American's unjust enrichment claim.

Westbury is correct that First American did not directly confer any benefit upon Westbury. The funds Westbury used to pay New Horizon's overdrafts allegedly belonged to First American's insured lenders, not First American. However, First American, as the insurer of the lenders' losses, stepped into the shoes of its insured and thus, by this path, First American did plausibly confer a benefit upon Westbury. This is quite distinct from the facts contained in the unpublished per curiam court of appeals case Westbury relies upon in its brief. (Docket No. 11 at 18.) In Isajiw v. Isajiw, 2011 WI App 27, the unjust enrichment claim failed because the alleged benefit proceeded from the plaintiff through a long list of intermediaries before finally coming to the defendant. Id. at ¶¶8-9. There was no allegation in Isajiw of any agency relationship persisting through all the intermediaries.

Westbury also contends that First American's claim fails because there is nothing inequitable about it retaining the fees it collected. (Docket No. 11 at 19.) Westbury contends that it had a legal or contractual right to charge those fees. It then notes that First American does not allege

18

that Westbury lacked such a right to charge fees and argues that an unjust enrichment claim cannot lie when there is a contract. (Docket No. 11 at 19 (citing Greenlee v. Rainbow Auction/Realty Co., 202 Wis. 2d 653, 672, 553 N.W.2d 257, 265 (Ct. App. 1996)).)

The complaint is silent as to the existence or non-existence of any contract governing these fees. Westbury has not directed the court to any authority indicating that First American must affirmatively allege that absence of a contract to state a claim for unjust enrichment. The court has not been presented with evidence that any contract existed, and even if such information was before the court, the court could not consider it at this stage without converting the present motion to dismiss into one for summary judgment, see Fed. R. Civ. P. 12(d). As alleged in the complaint, it is plausible that First American conferred upon Westbury the benefit of roughly $40,000.00 in fees, which Westbury accepted and retained under circumstances where such retention is inequitable. Therefore, the court must deny Westbury's motion to dismiss First American's claim for unjust enrichment.

## IV. CONCLUSION

First American adequately alleges in its complaint that Westbury knew that the funds in the escrow account did not belong to New Horizon and that New Horizon was misappropriating those funds. Under Wisconsin law, a bank may not knowingly permit a customer to pay its personal obligations with funds that do not belong to the customer and thus First American's first cause of action is sufficient to proceed. First American's claims relating to its contention that Westbury aided and abetted New Horizon's fraud (second, third, and fourth causes of action) are likewise sufficient to proceed because it is plausible Westbury wanted New Horizon's fraud to continue so that Westbury could continue to collect the resulting bank fees. Although Westbury did not have an affirmative duty to monitor New Horizon's transactions for fraud, the extent of New Horizon's overdrafts was so great that it was plausibly bad faith under the UFA for Westbury to not act.

Therefore, First American's fifth cause of action is sufficient to proceed. Finally, although presented together as the sixth cause of action in the complaint, quantum meruit and unjust enrichment are two separate causes of action in Wisconsin. The complaint contains allegations sufficient to sustain only a claim of unjust enrichment and therefore Westbury's motion to dismiss the quantum meruit claim shall be granted, but its motion to dismiss the claim for unjust enrichment shall be denied.

**IT IS THEREFORE ORDERED** that Westbury Bank's motion to dismiss for failure to state a claim, (Docket No. 10), is granted with respect to First American Title Insurance Company's cause of action for quantum meruit but denied as to all other causes of action.

Dated at Milwaukee, Wisconsin this 17th day of April, 2013.

_____
AARON E. GOODSTEIN
U.S. Magistrate Judge